IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-00801-REB-CBS

FREDRICK K. JENKINS,
        Plaintiff,
v.

CATHOLIC HEALTH INITIATIVES,
        Defendant.

───────────────────────────────────────────────────────────

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
───────────────────────────────────────────────────────────

Magistrate Judge Craig B. Shaffer

This civil action comes before the court on Defendant Catholic Health Initiatives' ("CHI's") Motion for Summary Judgment. Pursuant to the Order of Reference dated March 18, 2014 (Doc. # 4) and the Order Referring Motion(s) dated January 12, 2015 (Doc. # 39), this matter was referred to the Magistrate Judge. The court has reviewed the Motion, Mr. Jenkins's "Memorandum in Opposition" ("Response") (filed January 29, 2015) (Doc. # 40), CHI's Reply (filed February 17, 2015) (Doc. # 41), the exhibits, the entire case file, the hearings, and the applicable law and is sufficiently advised in the premises.

I.      Standard of Review

CHI seeks summary judgment on the First Amended Complaint ("FAC") pursuant to Fed. R. Civ. P. 56. "[T]he court may grant summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." *Montgomery v. Board of County Commissioners of Douglas County,*

*Colorado*, 637 F. Supp. 2d 934, 939 (D. Colo. 2009) (internal quotation marks and citations omitted). The moving party bears the initial burden of showing that there is an absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant need only point to an absence of evidence to support the non-movant's claim. *Celotex*, 477 U.S. at 325. If the moving party meets this burden, the non-moving party may not rest upon its pleadings, but must come forward with specific facts showing that there is a genuine issue for trial as to the elements essential to the non-moving party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Immaterial factual disputes and evidence that is not significantly probative will not defeat a motion for summary judgment. *Ayon v. Gourley*, 47 F. Supp.2d 1246, 1252 (D. Colo. 1998).

II.     Statement of the Case

CHI is a Colorado non-profit corporation that operates a national health system of hospitals, long-term care facilities, and community based health organizations. Mr. Jenkins worked as an analyst on CHI's Help Desk from approximately August 29, 2005 to October 27, 2011. (*See* Declaration of Kelly Enyart, Exhibit 3 to Motion (Doc. # 38 at ¶ 2)). Mr. Jenkins commenced this civil action on or about March 18, 2014 in his *pro se* capacity.   Counsel entered his appearance for Mr. Jenkins on September 15, 2014. (See Notice of Entry of Appearance (Doc. # 10), FAC (Doc. # 14)). Mr. Jenkins claims that CHI wrongfully terminated and failed to promote him based on his race and age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2,[1] and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). (*See* Doc. # 14 at ¶¶ 31-43).

---

[1]   Mr. Jenkins cites 42 U.S.C. § 2000e-5, governing enforcement provisions. (See Doc. # 14 at 7 of 9).

III.    Analysis

A.    Termination of Employment

Mr. Jenkins alleges that CHI unlawfully terminated his employment on October 27, 2011 based on his race and age. (*See* Doc. # 14 at ¶¶ 31-43). Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for an employer ". . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Mr. Jenkins does not present any direct evidence of discrimination. (See Doc. # 40-2 at 36).[2] Thus, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to his claims of race and age discrimination. *See Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) ("Where a plaintiff relies on circumstantial evidence, the Supreme Court has established a three-step burden-shifting framework for determining whether a plaintiff's evidence raises an inference of invidious discriminatory intent sufficient to survive summary judgment"); *Faulkner v. Super Valu Stores*, 3 F.3d 1419, 1425 n. 2 (10th Cir. 1993). (*McDonnell Douglas* proof standard likewise applies to ADEA claims).

Under the *McDonnell Douglas* analysis, "the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination." *Jackson v. City and County of Denver*, 628 F. Supp. 2d 1275, 1284 (D. Colo. 2008). "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason" for its employment decision.

---

[2]    "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Steele v. Kroenke Sports Enters.*, L.L.C., 264 F. App'x 735, 744-745 (10th Cir. Colo. 2008). Direct evidence "includes oral or written statements on the part of a defendant showing a discriminatory motivation" and "demonstrates on its face that the employment decision was reached for discriminatory reasons." *Id.* (internal quotation marks and citation omitted); *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (internal quotation marks and citation omitted).

*Id.* at 1284-85 (internal quotation marks omitted). If the defendant employer "presents such a reason, the plaintiff bears the ultimate burden of showing that these proffered reasons are a pretext for unlawful discrimination." *Id.* at 1285.

It is undisputed that Mr. Jenkins belongs to a protected class based on his race, African American, and his age, fifty-five (55) years old at the time of the events giving rise to his claims. (*See* Doc. # 14 at ¶¶ 1, 40, Doc. # 37 at 6 of 21, Doc. # 40-2 at 6, Doc. # 41 at 6 of 11). For purposes of the Motion only, Defendant does not contest that Mr. Jenkins can establish a prima facie case for his claims of discriminatory termination. (*See* Doc. # 37 at 6 of 21, Doc. # 41 at 6 of 11). If the court assumes that Mr. Jenkins has made out a prima facie claim, then "a presumption of discrimination arises," resulting in the burden shifting to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005) (citations omitted). At this stage of the *McDonnell Douglas* analysis, defendants' burden is "exceedingly light;" defendants must merely proffer non-discriminatory reasons, not prove them. *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165-66 (10th Cir. 2007) (internal quotation marks and citation omitted). *See also Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (same) (internal citation omitted); *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992) (at this stage, defendant is required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII."), *rev'd on other grounds by Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220 (10th Cir. 2000).

"If the defendant carries its burden of production, the presumption of discrimination drops out of the case," and "[t]he burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination." *Jaramillo*, 427 F.3d at 1307. *See also Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 147–49 (2000) (a plaintiff can withstand summary judgment if she presents evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reasons for the adverse employment action are pretextual). Once the employer's proffered reason is shown to be pretextual, the factfinder may infer that prohibited discrimination is the real cause for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993), *abrogated on other grounds by Gross,* 557 U.S. at 167.

Mr. Jenkins began working part-time as a Help Desk Analyst I at CHI in August of 2005. He became a full-time Help Desk Analyst I in March of 2006. (*See* FAC (Doc. # 14) at ¶ 2, Deposition of Fredrick K. Jenkins, Exhibit 1 to Response (Doc. # 40-2) at 17-19, Doc # 38 at ¶ 3). In April of 2008, Mr. Jenkins was promoted to Help Desk Analyst II. (See Doc # 38 at ¶ 3). Mr. Jenkins was on leave from approximately August 2008 to August 2009 for medical reasons. (See Doc. # 40-2 at 116-117, 160).

As a Help Desk Analyst II, Mr. Jenkins had responsibilities that included answering incoming calls and resolving IT issues from employees. (*See* Doc. # 40-2 at 18-20, Doc # 38 at ¶ 3). Help Desk employees worked in an office with 30-50 cubicles. (*See* Doc. # 40-2 at 65-66). Mr. Jenkins worked Thursday through Sunday on the second shift from 1:00 p.m. to 11:30 p.m. (*See id.*). Mr. Jenkins received a leadership position as a tier-two lead analyst on the second shift. (*See* Doc. # 40-2 at 69-70, Deposition of Johnny Dell Brinson, Exhibit 2 to Response (Doc. # 40-3) at 83). On October 7, 2011, Mr. Jenkins took a photograph with his cell phone that purportedly depicted a Help Desk employee, Mr. Brinson, asleep at his desk. (*See* Doc. # 40-2 at 65-72, Doc. # 40-4). Mr. Jenkins showed the photograph to a coworker and to his supervisor, Bartt Rakes. (*See id.* at 73-74). He does not know if any further action was taken after he showed the photograph to Mr. Rakes. (*See id.*). Soon after he took the photograph, Mr. Jenkins concluded

that Mr. Brinson committed a violation of company policy with regard to transferring a phone call. (*See* Doc. # 40-2 at 75-80, Doc. # 40-3 at 14-16).

On October 19, 2011, Mr. Brinson e-mailed to Mr. Rakes a complaint about Mr. Jenkins's workplace conduct. (*See* Doc. # 40-3 at 16, Doc. # 38 at ¶¶ 16-17, Exhibit 4 to Motion (Doc. # 37-4) at 4 of 9). Mr. Brinson overheard Mr. Jenkins state to other employees that he had been in Vietnam, was capable of going up to the nearby satellite communications tower and shooting people, and was capable of sneaking up behind someone and slitting their throat. (*See* Doc. # 40-3 at 16-19, 30-40, 46-50, 62-63, Doc. # 37-4 at 4 of 9). He also observed Mr. Jenkins using a work computer to browse the internet for firearms. (*See* Doc. # 37-4 at 4 of 9).

Also on October 19, 2011, another Help Desk employee, Adam Gunnett, emailed to Mr. Rakes a written complaint about Mr. Jenkins. (*See* Doc. # 37-4 at 6 of 9, Doc. # 38 at ¶ 18). Mr. Gunnett complained about offensive statements Mr. Jenkins made to him about his age and ethnicity, such as calling him a "little white boy." (*See id.*, Doc. # 40-3 at 19-20). Mr. Gunnett reported that on several occasions Mr. Jenkins had "spoken about shooting me with his crossbow" and "shooting me and others from the satellite tower across the way. (*See* Doc. # 37-4 at 6 of 9). "He said that he would 'pick us off from a distance.' " (*See id.*).

On October 20, 2011, Zan Lockhart, a contractor employed on the Help Desk, emailed a complaint to Mr. Rakes regarding "threats of violence and revenge to my coworkers and to the company in general" made by Mr. Jenkins. (*See* Doc. # 37-4 at 8 of 9, Doc. # 38 at ¶ 18).[3] Mr. Lockhart reported threats that included "sneaking up behind an individual to stab said victim in the back while cutting the victim[']s throat at the same time, . . . [t]ossing [a] grenade," and "[p]laying the part of a sniper perch on a near[by] tower adjacent to the company." (*See id.*). Mr. Lockhart

---

[3]  Mr. Brinson and Mr. Lockhart are both African American. (*See* Doc. # 40-2 at 143-144, Doc. # 40-3 at 76).

expressed fear for his personal safety and asked that his complaint remain anonymous. (*See id.*).

Help Desk supervisors forwarded these complaints to Kelly Enyart, CHI's Senior Business Partner, Employee Relations and Development. (*See* Doc. # 38 at ¶¶ 1, 15). Ms. Enyart conducted an investigation and individually interviewed ten Help Desk employees and contractors who worked the second shift. (*See id.* at ¶ 20). The interviews confirmed the allegations that Mr. Jenkins made inappropriate threatening and racial statements. (*See id.* at ¶¶ 21-22, Notes of Interviews, Exhibit 5 to Motion (Doc. # 37-5)). Ms. Enyart's review of Mr. Jenkins's computer use between August 23, 2011 and October 21, 2011 confirmed the allegations that he had browsed gun websites while at work. (*See* Doc. # 38 at ¶¶ 23-24, Website Activity Detail, Exhibit 6 to Motion (Doc. # 37-6)). Ms. Enyart, Help Desk management, and CHI's legal counsel determined that Mr. Jenkins had "made repeated threats of violence and racially derogatory comments to co-workers and management." (*See* Doc. # 38 at ¶ 25). "Based on the egregious nature of Jenkins' behavior that was documented by many witnesses," CHI decided to terminate Mr. Jenkins' employment for gross misconduct in violation of "CHI's core values, standards of conduct, and Violence-Free Workplace policy." (*See* Doc.# 38 at ¶¶ 4-5, 25, Acknowledgment and Certification signed by Mr. Jenkins, Exhibit 7 to Motion (Doc. # 37-7), Violence-Free Workplace policy, Exhibit 8 to Motion (Doc. # 37-8)).

On October 27, 2011, Ms. Enyart, Mark Buhrer, and Mr. Rakes met with Mr. Jenkins when he arrived at work and informed him that CHI had received complaints that he made inappropriate threatening and racial comments. (*See* Doc.# 38 at ¶ 26). Mr. Jenkins denied making such comments. (*See id.*, Doc. # 40-2 at 100-101). Ms. Enyart informed Mr. Jenkins that her investigation confirmed that he made inappropriate threatening and racial comments and that CHI was terminating his employment. (*See* Doc. #14 at ¶¶ 12-13, Doc. # 40-2 at 21, 100-102, 169-170;

Doc. # 38 at ¶ 26.). Mr. Jenkins responded "[b]ullshit," was "escorted out the door," and went home. (*See* Doc. # 40-2 at 102). The same day, CHI notified the Douglas County Sheriff's Department that it had terminated an employee who had made threatening comments in the workplace. (*See* Doc. # 14 at ¶ 15, Doc. # 38 at ¶ 27).

Mr. Jenkins denies that he made the alleged threatening or racial statements and argues that the "circumstances of Plaintiff's termination create an inference of racial discrimination because they do not show a good faith investigation of the incident." (*See* Doc. # 40 at 10-11 of 34, Doc. # 40-2 at 85-86; Doc. # 14 at ¶ 13). He argues that: (1) Mr. Brinson made false accusations against him "[b]ecause of the reports I made to the management on his improper activities, sleeping on the job and not following company policy," (2) Mr. Lockhart made false accusations against him because "he thought he was going to get hired" for "a full–time position at CHI," (3) Mr. Gunnett made false accusations against him because he wanted his job, (4) Ms. Enyart did not interview any employees "who would have taken the Plaintiff's side," (5) CHI did not get his side of the story, and (6) CHI made a report to the Douglas County Sheriff Department. (*See* Doc. # 40 at 10 of 34, Doc. # 40-2 at 96-97, 100, 112-114, 143-144, 148-149, 154-155, 169, 171, 173).

CHI has explained its actions in terms that are not facially prohibited by Title VII or the ADEA. To meet his burden of showing that CHI's reasons for terminating his employment were pretextual, Mr. Jenkins must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones v.* , 617 F.3d at 1280 (internal quotation marks and citation omitted).

To support an inference of pretext, to suggest that something more nefarious might be at

> play, a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda. This is because Title VII licenses us not to act as a "super personnel department" to undo bad employment decisions; instead, it charges us to serve as a vital means for redressing discriminatory ones.

*Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1211 (10th Cir. 2010) (citation omitted).

Evidence of pretext may take a variety of forms. *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1167-68 (10th Cir. 2007). *See also Kendrick*, 220 F.3d at 1230 (employee may show employer's proffered reason to be pretextual in a variety of ways: by showing that the stated reason is false, by showing that the employer acted contrary to a written company policy, or by showing that the employer acted contrary to an unwritten company policy or practice, among others). The plaintiff bears the burden of showing that each reason given by the employer is unworthy of credence. *Jaramillo*, 427 F.3d at 1308.

Mr. Jenkins fails to meet his burden of showing that his termination was a pretext for discrimination based on his race or age. First, his denial that he made the alleged inappropriate threatening and racial statements does not show that CHI's decision to terminate him was motivated by his race or age. Before making the decision to terminate Mr. Jenkins, Ms. Enyart took written statements of two employees and one contractor, separately interviewed ten Help Desk employees and contractors, and reviewed records of the websites Mr. Jenkins visited on his work computer. Mr. Jenkins concedes that he talked at work about his military training, including sneaking "up behind somebody to slit their throat, . . .grenade training, rifle training." (*See* Doc. # 40-2 at 94-96). He concedes that he browsed the internet at work to look at firearms, hunting weapons, assault rifles, and crossbows and that he ordered a crossbow online from his work computer. (*See* Doc. # 40-2 at 89-91, 168). To prevail on its motion for summary judgment, CHI is not required to prove that Mr. Jenkins actually made every statement that was alleged "or show

that its investigation was perfect; it need only show that it decided" to terminate him " 'based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation.' " *Graham v. Best Buy Stores, L.P.*, 298 F. App'x 487, 496 (6th Cir. 2008) (internal quotation marks and citation omitted). In determining whether the proffered reasons for a decision were pretextual, the court must examine "the facts as they appear to the person making the decision" to terminate Mr. Jenkins. *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation marks and citations omitted). "The factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions – simply disbelieving the employer is insufficient." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). "[W]here an employer honestly believes the reasons provided for a termination, a plaintiff cannot establish pretext, even if those reasons were wrongheaded in some manner." *Holshouser v. Abbott Labs.*, No. 31 F. Supp. 3d 964, 971-72 (N.D. Ill. Feb. 27, 2014) (*citing Forrester v. Rauland–Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason.") and *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (in employment discrimination cases "we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer.") (internal quotation marks, citation and emphasis omitted)). The record reveals legitimate grounds for CHI to believe the other employees' accounts of Mr. Jenkins's conduct, not Mr. Jenkins's denial.

Second, Mr. Jenkins's assertion that the three complainants, Mr. Brinson, Mr. Lockhart, and Mr. Gunnett, made false accusations about him is insufficient to show pretext because the

evidence does not show that they had any discriminatory intent that could be imputed to CHI. *See Kendrick*, 220 F.3d at 1231. Mr. Jenkins asserts that Mr. Brinson falsely accused him of making threatening statements as retribution for reporting that he was sleeping on the job and not following proper call transfer procedure. (*See* Doc. # 14 at ¶¶ 8-10; Doc. # 40-2 at 65-80). He asserts that Mr. Lockhart made false allegations because he was a contractor and wanted to get a full-time position and that Mr. Gunnett made false accusations because he wanted his job. (*See* Doc. # 40-2 at 96-98, 148). These reasons are not related to Mr. Jenkins's race or age. Mr. Jenkins does not know whether any of the complainants made their accusations because of his race. (*See* Doc. # 40-2 at 142-145). Mr. Jenkins acknowledged that Mr. Gunnett did not discriminate against him based on his race. (*See* Doc. # 40-2 at 144-145). Mr. Jenkins fails to demonstrate any discriminatory motives of the three complainants. Therefore, Mr. Jenkins cannot establish that any discriminatory motivation by the complainants was known to CHI at the time it decided to terminate his employment. "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (internal quotation marks and citation omitted). *See also Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1251 (10th Cir. 2006) (evidence did not suggest employer's beliefs were not held in good faith); *Miller*, 396 F.3d at 1111 ("Pretext exists when an employer does not honestly represent its reasons for terminating an employee."). Mr. Jenkins demonstrates no reason that CHI could not have believed in good faith the complaints about him.

Nor does Mr. Jenkins present any evidence that "a biased subordinate, who lacks decisionmaking power, use[d] the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Minevich v. Spectrum Health-Meier Heart Center*, 1

F. Supp.3d 790, 805 (W.D. Mich. 2014) (addressing "cat's paw" or "rubber stamp" liability). *See also Ward v. Jewell*, 772 F.3d 1199, 1205 (10th Cir. 2014) ("To survive summary judgment on a 'Cat's Paw' theory, [plaintiff] must establish bias by the subordinates, . . . their influence in the decision-making process, and [the] adoption of [their] biased recommendation without an independent investigation." (citations omitted). "[T]he issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 487 (10th Cir. 2006). "[B]ecause a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action, an employer can avoid liability by conducting an independent investigation of the allegations against an employee." *Id.* at 488. "[T]o defeat a finding of pretext, the employer need only show that it had an honest belief in the proffered basis for the adverse employment action based on a reasonable reliance on the facts it knew at the time." *Minevich*, 1 F. Supp.3d at 805. Mr. Jenkins has not established a genuine issue of material fact that any employee's "bias translated into discriminatory action that caused [his] termination." *Id.* at 490.

Mr. Jenkins also argues that CHI's investigation of the allegations against him establishes a pretext for discrimination because CHI did not interview everyone he believes should have been interviewed and he was not interviewed and given an opportunity to tell his side. (*See* Doc. # 14 at ¶ 21; Doc. # 40-2 at 100, 112-114, 174-175). "In determining whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). The evidence demonstrates that Ms. Enyart made an independent investigation, gathering written statements,

interviews of ten Help Desk employees and contractors, and records of Mr. Jenkins's computer use. Mr. Jenkins presents nothing more than a suggestion "that defendants conducted imperfect assessments and were mistaken in their conclusions—not that they subjected [him] to adverse employment actions because of any discriminatory animus . . . ." *Macshane v. City of New* York, Nos. 06–CV–06024, 06–CV–06025, 06–CV–407, 06–CV–4817, 06–CV–4933, 06–CV–4935, 06–CV–6175, 06–CV–6278, 06–CV–6297, 06–CV–6732 (RRM)(RML), 2015 WL 1298423, at * 19 (E.D.N.Y. March 23, 2015) (citing *DeFina v. Meenan Oil Co., Inc.*, No. 10–CV–5068 (JFB), 2013 WL 596622, at *11 (E.D.N.Y. Feb.15, 2013) ("Plaintiff's arguments raise issue only as to the accuracy or the wisdom of defendants' decision to terminate plaintiff, but fail to create a triable issue of fact as to whether the proffered reasons for plaintiff's termination were a pretext for discrimination.").

When he was asked about his alleged inappropriate threatening and racial comments, Mr. Jenkins denied making such comments and responded "[b]ullshit." (*See* Doc. # 40-2 at 101-102). CHI's policies provide for immediate corrective action, which includes immediate termination from employment. (*See* Doc. # 38 at ¶ 6, Exhibit 10 to Motion (Doc. # 37-10)). *See Lobato v. State of New Mexico Environment Department*, 733 F.3d 1283, 1290 (10th Cir. 2013) (finding no inconsistency rising to the level of a genuine dispute about pretext where plaintiff pointed to no written policy that mandated progressive discipline). Mr. Jenkins's belief that his supervisor, Bartt Rakes, was a racist (*see* Doc. # 40-2 at 145, Doc. # 40 at 11, 18 of 34) is merely subjective and is unsupported by any evidence. *See, e.g., Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 (4th Cir. 2002) (finding that the affidavits of various employees expressing their subjective beliefs that a supervisor was "racist" were "insufficient to create a genuine issue of material fact as to any discriminatory conduct" by the defendant employer); *Robinson v. Duncan*, 775 F. Supp. 2d 143,

154 (D.D.C. 2011) (employees' opinions that supervisor is a racist constituted conclusory speculation devoid of any factual foundation); *Rollins v. Missouri Dep't of Conservation*, 315 F. Supp. 2d 1011 (W.D. Mo. 2004) (employer's reasons for terminating employee were not pretexts for race discrimination where employee's belief that supervisor was racist was subjective). "A plaintiff's general, subjective belief that the Defendants treated him differently because of his race is insufficient evidence to show that the legitimate, nondiscriminatory reasons for terminating [him] were lies used to cover the real reason for the termination". *Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998).

Mr. Jenkins also alleges that CHI treated him less favorably than two white former employees ("Comparators One and Two") who were discharged for making threatening statements. (*See* Doc. # 14 at ¶¶ 20-21; Doc. # 40-2 at 112-113). Comparator One, a 35-year old Caucasian male, was discharged from his employment on December 3, 2007 after he made remarks that "[s]ometimes I just want to get a gun and shoot everyone here." (*See* Doc. # 38 at ¶¶ 28-32, Exhibit 9 to Motion, Documentation of employee termination meeting (Doc. # 40-9) at 4 of 11). Comparator Two, a 63-year old Caucasian male, was placed on paid administrative leave pending a further investigation and terminated from his employment on March 5, 2009 after he stated, "If I owned a gun, I would go 'postal' right now!" (*See* Doc. # 38 at ¶¶ 28, 30-32, Employee Notice of Administrative Leave, Exhibit 8 to Response (Doc. # 40-9 at 8 of 11)). To establish a prima facie case of disparate treatment, a plaintiff must demonstrate: (i) that he belongs to a protected class; (ii) that he suffered from an adverse employment action; and (iii) that his employer treated similarly situated employees differently. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). To establish an inference of discrimination with evidence of disparate treatment, a plaintiff must show that the comparator employees were similarly situated. *Hysten v.*

*Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1182 (10th Cir. 2002). A plaintiff may show pretext "by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Smothers v. Solvay Chemicals*, 740 F.3d 530, 540 (10th Cir. 2014) (internal quotation marks and citation omitted).

The evidence does not demonstrate that Mr. Jenkins was similarly-situated to or treated differently than Comparators One and Two. Different supervisors or decision makers made the decisions regarding him and Comparators One and Two. (*See* Doc. # 40-9). *See Smothers*, 740 F.3d at 540 ("To be similarly situated to the plaintiff, the other employee must share the same supervisor or decision maker."). *See also McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (To be similarly situated, employees must "deal with the same supervisor and [be] subject to the same standards governing performance evaluation and discipline.") (internal quotation marks and citation omitted). Mr. Jenkins was disciplined almost four years after Comparator One and more than one and a half years after Comparator Two. When managers met with Comparator One, he "was remorseful, apologetic, accepted full responsibility for his actions," repeatedly assured them that he would never act on his remarks, and "stated that he intended to voluntarily resign his employment." (*See* Doc. # 40-9 at 4 of 11). Mr. Jenkins denied his alleged conduct and responded "[b]ullshit." (*See* Doc. # 40-2 at 101-102). Comparator Two was placed on administrative leave on or about February 11, 2009 pending "further investigation and fact-finding" and terminated on March 5, 2009. (*See* Doc. # 37-3 at ¶ 30, Doc. # 40-9 at 8 of 11). CHI's policies permit but do not require that an employee be placed on administrative leave "[i]n situations where time is needed to investigate." (*See* Doc. # 37-10 at 3 of 5). Comparator Two's conduct was in the nature of noncooperation and refusal to do work, with one veiled reference to violence. (*See* Doc.

# 40-9 at 9-11 of 11). Reports of Mr. Jenkins's conduct cited repeated statements that were understood by numerous employees as threats of violence. (*See* Doc. # 37-5).

Regarding Mr. Jenkins's allegation that CHI "allowed" Comparator Two "to go through the employment-assistance program before they terminated him," the evidence shows that Comparator Two was required "to make contact with EAP for a management referral session." (*See* Doc. # 14 at ¶ 21, Doc. # 40-2 at 112-113, Doc. # 40-9 at 8 of 11). As all CHI employees have access to counseling through the Employee Assistance Program ("EAP"), evidence that CHI offered EAP counseling to the comparator employees or that Mr. Jenkins chose not to avail himself of EAP services is not evidence that CHI discriminated against him. (*See* Doc. # 38 at ¶ 7, Employee Assistance Program Policy, Exhibit 11 to Motion (Doc. # 37-11)). Mr. Jenkins also alleges discrimination based on CHI's report to the Douglas County Sheriff's Department. (*See* Doc. # 14 at ¶ 21). The evidence shows that upon terminating Comparator One in 2007 and Mr. Jenkins in 2011, CHI notified the Douglas County Sheriff's Department in the interests of security and safety concerns. (See Doc. # 38 at ¶ 27; Doc. # 40-9 at 5 of 11). Mr. Jenkins's allegations that CHI did not place him on administrative leave or refer him to the EAP and filed a report with the Douglas County Sheriff's Department do not establish a pretext for discrimination based on his race or age.

Mr. Jenkins also alleges disparate treatment based on a Paid Time Off ("PTO") request and denial of permission to work from home. (*See* Doc. # 14 at ¶ 22; Doc. # 40-2 at 163-164, 176). Mr. Jenkins asserts that on one occasion Help Desk Supervisor Andy Dickinson did not treat his PTO request on a first come, first served basis because of his race. (*See id.*). Mr. Jenkins does not provide the date or any specific evidence regarding the alleged PTO incident. His unsupported allegation of impartial treatment is insufficient to support an inference of discrimination based on

16

his race or age. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1398 (10th Cir. 1997). There is no evidence in the record that addresses Mr. Jenkins's allegation that he was not permitted to work from home while on medical leave in 2009 when another employee was permitted to work from home while on medical leave in 2006. (*See* Doc. # 14 at ¶ 22).

In sum, CHI has met its burden of proof by articulating its legitimate, non-discriminatory reason for terminating Mr. Jenkins's employment for misconduct based on threats of violence and racially demeaning comments he made to co-workers and management. In a four-year period, CHI discharged three employees based on complaints from co-workers and after investigations substantiated the complaints. Mr. Jenkins has not made a sufficient showing of pretext to overcome CHI's proffered legitimate non-discriminatory reason for terminating his employment. CHI is entitled to summary judgment on Mr. Jenkins's discriminatory discharge claims.

B.    Denial of Promotion

Mr. Jenkins also alleges that CHI failed to promote him based on his race and age. (*See* Doc. # 14 at ¶¶ 38, 43).

> Under the familiar three-step allocation of burdens of proof mandated by McDonnell Douglas, a plaintiff alleging a failure-to-promote claim must initially establish a prima facie case, demonstrating that: (1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled. If the plaintiff carries her burden of establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. This shifts the burden back to the plaintiff to proffer evidence that the employer's reason is pretextual.

*Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003) (citations omitted). *See also Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1238 (10th Cir. 2002) (same).

CHI first argues that Mr. Jenkins cannot meet his burden to establish a prima facie case of

race or age discrimination. It is undisputed that Mr. Jenkins is a member of a protected class and was over the age of forty at all times relevant to this lawsuit. CHI argues that Mr. Jenkins cannot establish a prima facie case of discrimination based on failure to promote because he cannot establish that he was at least as qualified for the alleged promotions as the selected candidates. "To establish a prima facie case of failure to promote, Mr. [Jenkins] need not show that he is equally or better qualified than the person selected for the position." *Buchanan v. Bridgestone/ Firestone, Inc.*, No. 96-6315, 113 F.3d 1245, at * 3 (10th Cir. May 29, 1997) (internal quotation marks and citation omitted). "It is enough to prove by a preponderance of the evidence that [he] applied for an available position for which [he] was qualified, but was rejected under circumstances that give rise to an inference of unlawful discrimination." *Id.*

Mr. Jenkins alleges that during the six years he worked at CHI he applied for approximately 42 positions for which he was not selected. (*See* Doc. # 14 at ¶¶ 3, 38, 43, Doc. # 40-2 at 44). Mr. Jenkins specifically identifies only three positions for which he applied and was not selected: Meditech Analyst, Desktop Support, and Clinical Help Desk ("eClinical Desk"). (*See* Doc. # 40-2 at 45, 52, 55-56). First, the evidence does not demonstrate that any of the three positions he sought included a pay increase or were promotions. (*See* Doc. # 40-2 at 39, 48-50, 64, Doc. # 40-3 at 67 ("I wouldn't say it was really a promotion. It was just moving to a different desk. It wasn't a pay increase doing it.")). *See, e.g., DeFlon v. Danka Corp.*, No. 99-2239, 1 F. App'x 807, 818 (10th Cir. 2001) (concluding that plaintiff's failure to promote claim failed where, among other things, there was no evidence establishing that the position at issue was a promotion as opposed to a lateral transfer).

Next, Mr. Jenkins asserts that he applied for the Meditech Analyst position in "[a]bout 2010, 2011." (See Doc. # 40-2 at 46). He admits that he was not qualified for the Meditech Analyst

position.[4]  (See Doc. # 40-2 at 45-46).  *See Lusk v. Senior Servs.*, No. 13-35621, 2015 WL 2225454, at *1 (9th Cir. May 13, 2015) (plaintiff failed to establish a prima facie case of gender discrimination because he did not meet the minimum qualifications for the job).  He asserts that the individuals selected, Jesus Rodriguez and Eric Flower, were not qualified either.[5]  His own evidence shows that he does not know whether the selected candidates met the qualifications for that position or whether they were more or less qualified than him. (*See* Doc. # 40-2 at 46-47).  Mr. Jenkins "can't really say" whether he was not promoted to this position because of race discrimination.  (See Doc. # 40-2 at 47).

Mr. Jenkins also asserts that he was more qualified than the individual who was selected for the Desktop Support position, Andrew Wu.[6]  (See Doc. # 40-2 at 48-49).  Mr. Jenkins offers only his conclusory opinion that Mr. Wu was less qualified than him. (*See* Doc. # 40-2 at 48-49).  "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028 (10th Cir. 2011)(citation omitted).  "We do not look to the plaintiff's subjective evaluation of the situation." *Id.* Mr. Jenkins's unsupported opinion that he was better qualified for the position is insufficient to show a discriminatory motive and does not raise an issue of material fact. *Committe v. Oregon State Univ.*, No. 3:13-CV-01341-ST, 2015 WL 2170122, at *11 (D. Or. May 8, 2015) (citations omitted).

In 2010, CHI created and began staffing the eClinical Help Desk to serve physicians with

---

[4]  The Job Title and Requisition for this position is Application Analyst I (1000015203). (*See* Doc. # 38 at ¶ 8, Exhibit 12 to Motion (Doc. # 37-12)).

[5]  Mr. Jenkins did not submit an application for the Meditech position for which Mr. Flower was selected. *See, e.g., Bennett v. Quark, Inc.*, 258 F.3d 1220, 1229 (10th Cir. 2001) (holding that plaintiff failed to establish a prima facie case of discrimination because she failed to show that she applied for the position), *overruled on other grounds as explained in Boyer v. Cordant Technologies, Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003).

[6]  The Job Title and Requisition for this position is Technical Services Analyst (1100006720). (*See* Doc. # 38 at ¶ 10, Exhibit 14 to Motion (Doc. # 37-14)).

IT-related issues. (*See* Doc. # 40-2 at 40).[7] Mr. Jenkins alleges that CHI failed to promote him to

the eClinical Help Desk because of his race and age. (*See* Doc # 14 at ¶ 3, 4, 6, 37-38, 42-43). Mr.

Jenkins asserts that Karen Vogel and Aaron Becker, "who were not African Americans" and were

less qualified than him," were "promoted to the eClinical Desk."[8]  (*See* Doc. # 14 at ¶ 6, Doc. #

40-2 at 52-56). Mr. Jenkins has an Associate's degree. (*See* Doc. # 40-2 at 160). He "did not know

what experience [Ms. Vogel] had." (See Doc. # 40-2 at 53). Ms. Vogel has two Bachelors of

Science degrees. (*See* Doc. # 38 at ¶ 13, Exhibit 17 to Motion (Doc. # 37-17) at 13 of 16).

Mr. Jenkins asserts that Mr. Becker was less qualified than him for the eClinical Desk

position because he had been employed with CHI longer and had more experience and

knowledge of its programs. (See Doc. # 40-2 at 38-39, 53-54, 159-160). However, "[m]ere

seniority does not support a finding that [he] was more qualified for a different job." *Durham v.*

*Xerox Corp.*, 18 F.3d 836, 840 (10th Cir. 1994). Nor does his assertion that he performed eClinical

Desk duties at night and on the weekends demonstrate that he was more qualified. (*See* Doc. #

40-2 at 40-42, Doc. 3 40 at 24 of 34). Temporarily filling in for a position does not raise a genuine

issue of fact as to his qualification for the position. *Chytka v. Wright Tree Service, Inc.*, 925 F.

Supp. 2d 1147, 1166 (D. Colo. 2013). Mr. Jenkins does not know Mr. Becker's "technology

background" or when he transitioned from a contract employee to a full-time employee of CHI.

(*See* Doc. # 40-2 at 54). Mr. Becker has qualifications such as a Bachelor of Science degree in

Information Technology, clinical experience working as a paramedic in the Armed Forces, and

hands on training in Clinical hardware, including iPads, all of which specifically applied to the job

of assisting physicians on the eClinical Desk. (*See* Doc. # 40-2 at 160, Doc. # 37-17 at 1-7, Doc. #

---

[7]  In January of 2013, CHI outsourced the functions of the Help Desk, including the Clinical Help Desk, thereby eliminating all Help Desk analyst positions. (*See* Doc. # 40-2 at 135, Doc. # 40-3 at 82-83, Doc. # 38 at ¶ 14).

[8]  The Job Titles and Requisitions are Help Desk Analyst I- Clinical (1000014154), Help Desk Analyst II (Clinical) (1000006785), and Help Desk Analyst III (Clinical) - Englewood, CO (1000006783). (*See* Doc. # 38 at ¶ 12, Exhibit 16 to Motion (Doc. # 37-16)).

38 at ¶ 13, Doc. # 40-3 at 77-78 (describing eClinical Desk work)). Mr. Becker's promotion to the eClinical Desk was from an Analyst I to an Analyst II. (*See* Exhibit 17 to Motion (Doc. # 37-17) at 1-7). Mr. Jenkins sought an Analyst III position on the eClinical Desk. (See Doc. # 40-2 at 38, 43-44, 159-160).

Mr. Jenkins asserts that Rhett Dudley was promoted to the eClinical Desk. (*See* Doc. # 40-2 at 52). He states that he was at least as qualified as Mr. Dudley because they both began working on the Help Desk at the same time, worked on the same shift, and performed the same duties. (See Doc. # 40-2 at 54-55). Mr. Jenkins does not identify any managers who made the hiring decisions for the positions he sought. (See Doc. # 40-2 at 146). Neither Title VII nor the ADEA "make unexplained differences in treatment" or "inconsistent or irrational employment practices" unlawful. The law "prohibits only intentional discrimination based upon an employee's protected class characteristics." *Salguero*, 366 F.3d at 1178 (internal quotation marks and citation omitted). Mr. Jenkins's speculative and conclusory allegations lack evidentiary support in the record. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875-76 (10th Cir. 2004)("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

Mr. Jenkins has not met his prima facie burden to show that he was as or more qualified than the candidates selected for the Meditech Analyst, Desktop Support, and Clinical Help Desk positions. The promotions of Ms. Vogel, Mr. Becker, and Mr. Dudley do not support a prima facie case of discrimination against Mr. Jenkins. For his failure to establish a prima facie case, summary judgment is properly granted in favor of CHI on Mr. Jenkins's claims for failure to promote based on his race and age.

Even if Mr. Jenkins established a prima facie case of discrimination for failure to promote,

CHI articulates legitimate, non-discriminatory grounds for not promoting him, thus satisfying its burden under the *McDonnell Douglas* burden-shifting analysis. CHI selected other candidates for the Meditech Analyst, Desktop Support, and Clinical Help Desk positions because it determined those candidates were better qualified for those positions. CHI's reasons for not promoting Mr. Jenkins rather than other candidates are not facially prohibited by the Title VII or the ADEA and are sufficient to rebut a prima facie case.

Mr. Jenkins fails to present sufficient evidence to create an inference that CHI's promotion decisions were a pretext for discrimination based on his race or age. He admits that the only evidence to support his claim for age discrimination is that younger people were promoted and he was not. (See Doc. # 40-2 at 35). He also admits that no one at CHI made any references to or comments about his age. (See Doc. # 40-2 at 36). He does not present evidence of the ages of other employees who were promoted. None of Mr. Jenkins's evidence "affirmatively supports an inference that age played any role in [the] decision" by CHI to not promote him. *Bradley v. Denver Health & Hosp. Auth.*, 734 F. Supp. 2d 1186, 1209 (D. Colo. 2010) (citation omitted). Mr. Jenkins "has been unable to demonstrate that there is a triable issue of pretext -- or, alternatively, in prima facie case terms, [evidence which gives] rise to a reasonable inference of age discrimination." *Id.*

Mr. Jenkins alleges that no African Americans were employed on the eClinical Desk before he was terminated. (See Doc. # 14 at ¶ 4, Doc. # 40-2 at 56-57). In fact, Mr. Brinson was assigned to the eClinical Desk before he was terminated. (*See* Doc. # Doc. # 37-4 at 4 of 9). It is undisputed that positions for the eClinical Desk were not posted. (See Doc. # 14 at ¶ 4, Doc. # 40-2 at 38, 63-64, 118-119, 155-156, Doc. # 40-3 at 74, 81). Sometime in 2010, Mr. Jenkins merely asked "why I wasn't promoted to the eClinical Desk." (See Doc. # 40-2 at 118-119). He asserts that "they pick and choose who they want to be on the eClinical Desk." (See Doc.# 40-2 at 37, 157).

> [T]hey only wanted people on there that they liked. Like Aaron Becker, him

and DJ practiced karate together, some form of marshal arts. He played volleyball. Bartt played volleyball. Karen [Vogel], she came in with the district manager, Bill Stevenson. Rhett Dudley, he was liked by Bill Stevenson and Mark Buhrer.

(*See* Doc. # 40-2 at 156-157, *see also* Doc. # 40 at 11 of 34 ("[p]ositions on the eClinical Desk were handed out to favorites"). This evidence does not support an inference of discrimination based on Mr. Jenkins's race or age.

Mr. Jenkins alleges generally that "it is very difficult for African Americans at CHI's corporate Help Desk, in particular, to get ahead." (See Doc. # 14 at ¶23). When Mr. Jenkins started working at CHI, there were only six to eight employees on the Help Desk and he was the only African American. (See Doc. # 40-2 at 158). In 2011, there were 30 to 50 employees on the Help Desk of which approximately six to eight were African American. (See Doc. # 40-2 at 57-60, Doc. # 40-3 at 75). Mr. Jenkins concedes that another African American was promoted. (*See* Doc. # 40-2 at 164-65, *see also* Doc. # 40-3 at 78-79 (Mr. Brinson perceived no discrimination at CHI)). Because Mr. Jenkins does not present any "evidence of bias beyond his subjective opinion-no statistics, no racist comments by supervisors or co-workers, no 'me too' testimony from other employees-his claim of disparate treatment . . . cannot be sustained." *Green v. Texas A & M Univ. Sys.*, No. CIV.A. H-07-1115, 2008 WL 416237, at *4 (S.D. Tex. Feb. 14, 2008).

In sum, Mr. Jenkins has not presented facts from which a reasonable jury could conclude that any specific decision to not promote him was so meritless as to call into question its actual motivation. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (finding no evidence "of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.") (internal quotation marks and citation omitted). CHI is

entitled to summary judgment on Mr. Jenkins's claims for failure to promote.

Accordingly, IT IS RECOMMENDED that Defendant Catholic Health Initiatives' Motion for Summary Judgment (filed January 9, 2015) (Doc. # 37) be GRANTED and that judgment be entered on the First Amended Complaint (Doc. # 14) in favor of Defendant and against Plaintiff.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to

certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado this 27th day of May, 2015.

BY THE COURT:


   s/Craig B. Shaffer
United States Magistrate Judge